MARC P. BERGER*
REGIONAL DIRECTOR
Lara S. Mehraban*
Adam S. Grace*
Preethi Krishnamurthy*
Rhonda L. Jung*
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)
*Appearing pursuant to Local Civil Rule 83.5(e)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>        -against-<br><br>HOWARD M. APPEL,<br><br>                  Defendant. | Case No. _____<br><br><br>__COMPLAINT__ |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendant Howard M. Appel ("Appel"), alleges as follows:

## SUMMARY

1.  From approximately 2012 through 2013 (the "Relevant Period"), defendant Appel orchestrated a fraudulent scheme to manipulate the prices of three microcap companies' stock. During part of the Relevant Period, Appel was on supervised release following his criminal conviction for a separate securities fraud scheme.

2.  Appel's manipulative scheme followed a similar pattern for each of the three companies: Appel obtained a large block of stock in each company and also secretly controlled large,

additional amounts of shares in each company held by his associates. Appel then directed his associates to engage in manipulative, coordinated trading to create the appearance of liquidity and active trading in the stocks. Appel intended for this trading to support and raise the shares' prices enough to raise capital for the companies and qualify them for listing on a national securities exchange.

3.     During and after his manipulative conduct, Appel obtained over $3 million in profits by selling his shares in the companies into the public market.

## VIOLATIONS

4.     By virtue of the foregoing conduct and as alleged further herein, Appel violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1) & (3)]; Sections 9(a)(1), 9(a)(2), and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(1) & (2), 78j(b)]; and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

5.     Unless Appel is permanently restrained and enjoined, he will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of a similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)] and seeks a final judgment: (i) permanently restraining and enjoining Appel from violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 9(a) and 10(b) [15 U.S.C. §§ 78i(a) & 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; (ii) requiring Appel to disgorge the ill-gotten gains he received as a result of the violations and to pay prejudgment interest thereon, pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; (iii) ordering Appel to pay civil money penalties, pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange

2

Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (iv) permanently prohibiting Appel from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (v) permanently prohibiting Appel from participating in any offering of a penny stock, pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and (vi) ordering any other relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

8.      Appel has, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9.      Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because, among other things, Appel resides in the Eastern District of Pennsylvania.

## DEFENDANT

10.     **Appel**, age 57, resides in Wayne, Pennsylvania. On September 21, 2004, Appel pleaded guilty in the United States District Court for the Eastern District of New York to one count of conspiracy to commit securities fraud and one count of conspiracy to commit money laundering in connection with his role in a multi-million-dollar pump-and-dump scheme involving the stock of

several microcap issuers.[1] Appel was incarcerated from June 10, 2008 through June 8, 2010 and then on supervised release until June 8, 2013.

## THE THREE STOCK ISSUERS

11.     Rio Bravo Oil, Inc. ("Rio Bravo") is a Nevada company, headquartered in Houston, Texas, that purports to engage in the acquisition, development, and exploration of oil and natural gas properties. During the Relevant Period, Rio Bravo's common stock was registered with the Commission pursuant to Exchange Act Section 12(g) [15 U.S.C. § 78l(g)] and quoted on OTC Bulletin Board ("OTC BB"), an interdealer quotation system, under the ticker symbol "RIOB." Throughout the Relevant Period, Rio Bravo's common stock met the definition of a "penny stock" under Exchange Act Section 3(a)(51) [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240. 3a51-1], because the stock traded below five dollars per share and did not satisfy any of the exceptions to the definition of "penny stock" set forth in Rule 3a51-1.

12.     **Red Mountain Resources, Inc. ("Red Mountain")** is a Texas company that, during the Relevant Period, purported to be engaged in the acquisition, development, and exploration of oil and natural gas properties. During that time, Red Mountain's common stock was registered with the Commission pursuant to Exchange Act Section 12(g) [15 U.S.C. § 78l(g)] and quoted on the OTC BB and OTC Link, another interdealer quotation system, under the ticker symbol "RDMP." On March 8, 2016, Red Mountain filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas.

13.     **Virtual Piggy, Inc. ("Virtual Piggy"),** now known as Rego Payment Architectures, Inc., is a California corporation that purports to provide a platform for children to make online

---

[1]     On March 15, 2005, Appel also pleaded guilty to one count of enterprise corruption in the Supreme Court of the State of New York, New York County.

purchases under parental supervision. During the Relevant Period, Virtual Piggy's common stock was registered with the Commission pursuant to Exchange Act Section 12(g) [15 U.S.C. § 78l(g)] and was quoted on OTC BB and OTC Link under the ticker symbol "VPIG."

FACTS

**A.      Overview of the Scheme**

14.      Starting in approximately 2010, Appel became involved with Rio Bravo, Red Mountain, and Virtual Piggy (together, the "Issuers"), ostensibly as a consultant working through other entities he controlled.

15.      Appel's involvement with the Issuers enabled him to purchase or obtain significant blocks of the Issuers' stock at little or no cost.

16.      Appel then recruited several investors (his "Associates") to acquire large blocks of stock in the Issuers through private placements or other private transactions.

17.      Appel typically permitted his Associates to purchase the Issuers' shares at a discount through private placements of the stock only if the Associates also agreed to buy additional shares on the open market.

18.      Appel used his role with the Issuers to monitor and control his Associates' trading activity, including by obtaining from the Issuers certain Depository Trust Company ("DTC") data reflecting purchases and sales of the shares.[2]

19.      To control the Issuers' stock price and liquidity, Appel insisted that his Associates obtain his permission before selling their shares in the market and reprimanded Associates who sold without his permission.

---

[2]      DTC is a clearing agency, registered with the Commission, that provides settlement services for securities trades, among other things.

5

20.     Appel also controlled certain Associates' trading activity by entering orders for their brokerage accounts over the phone himself or by accessing their brokerage accounts online.

21.     Appel, directly or indirectly through his Associates, controlled a significant portion of the Issuers' shares available for trading, or the "float."

22.     To support the market price by creating the appearance of liquidity and active trading in the Issuers' stock and to raise the prices of the Issuers' shares enough to qualify them for listing on a national exchange, Appel engaged in matched trades and other coordinated trading activity between and amongst his own accounts and his Associates' accounts.

23.     During and after his manipulative activity, Appel sold his shares into the market and obtained profits of over $3 million.

**B.     Red Mountain**

24.     In November 2011, Appel owned or controlled, directly or indirectly through his Associates, a significant portion of Red Mountain's float.

25.     On November 30, 2011, Red Mountain filed a Form 8-K with the Commission disclosing that, five days earlier, Red Mountain had issued two convertible promissory notes in the amounts of $1.5 million and $1 million, respectively, to two Swiss companies.

26.     In fact, the Swiss citizen who controlled both Swiss companies was one of Appel's Associates (the "Swiss Associate").

27.     From March 5 through December 31, 2012, the Swiss Associate purchased 3,483,000 shares of Red Mountain common stock in four accounts—none in his name—over which he held power of attorney.

28.     Of those 3,483,000 shares, the Swiss Associate purchased approximately 3,336,400 shares in pre-arranged matched trades from accounts Appel owned or controlled, directly or indirectly.

29.     These matched trades included three purchases on March 7, 8, and 9, 2012, executed at $1.47, $1.46, and $1.50 per share, respectively. On each of those days, the Swiss Associate's transactions were effected at the low trading price of the day.

30.     Appel also monitored DTC data to detect Associates selling Red Mountain shares against his directions.

31.     For example, in June 2013, Appel expressed a concern that certain Associates in his network were secretly selling stock when they were not supposed to: "[W]e are getting backdoored out of Europe and I want to see if we can tell where it is coming from."

32.     In addition, Appel bought and arranged to have his Associates buy Red Mountain stock on the open market at artificially high prices in order to manipulate the stock price—that is, to increase the stock price from the natural level established by supply and demand.

33.     For example, in an email to two Associates on January 23, 2013, Appel wrote:

> Bot 14500 red mtn [Red Mountain] yesterday and had accumulated 9k over the last few weeks. Avg. 865. Have ur guy bid for 12500 at .87 and another 7500 at .85 in case we get hit by selling today. (My guy above that bidding .87).

34.     In response, one of Appel's associates expressed concern: "Howard – we said no more above 80c [80 cents] – why are you buying at those levels."

35.     On January 22, 2013, Red Mountain shares traded between a low of $0.80 and a high of $0.90 per share. The following day, the stock traded between a low of $0.85 and a high of $0.89 per share.

**C.    Rio Bravo**

36.     As with Red Mountain, Appel used manipulative techniques to artificially support or inflate Rio Bravo's stock price by creating a false appearance of supply and demand and of increased trading volume.

37.     In addition, although ostensibly a mere consultant to Rio Bravo, Appel actually exercised significant decision-making authority with respect to the company's business operations and capital-raising activities, such that he functioned as an undisclosed *de facto* officer of Rio Bravo.

38.     Among other things, Rio Bravo's nominal chief executive and chief financial officers regularly consulted with Appel concerning major corporate decisions and at times were required to obtain Appel's approval for such decisions.

39.     For example, in late 2011, to enable Rio Bravo (under a predecessor name) to file a Form 10-K with the Commission, Appel selected Rio Bravo's auditor.

40.     In February 2012, Appel supervised the transfer of shares in Rio Bravo's predecessor company to entities that he and his Associates controlled.

41.     On February 20, 2012, Rio Bravo began trading in the open market. That day, only one trade occurred in Rio Bravo common stock, for 1,000 shares, setting the market price at $0.85 per share. When Rio Bravo's shares began trading, Appel owned or controlled, directly or indirectly through his Associates, most of Rio Bravo's float.

42.     From February 21 through 29, 2012, the Swiss Associate purchased 1,980,000 shares of Rio Bravo common stock.

43.     As Appel and the Swiss Associate had arranged, the Swiss Associate purchased almost all of these shares—1,918,195 of the total 1,980,000 shares he bought during that period—from brokerage accounts Appel owned or controlled, directly or indirectly through an Associate.

44.     For example, on February 21, 2012, the Swiss Associate purchased a total of 200,000 Rio Bravo shares in four transactions of 50,000 shares each at a price of $0.755 per share.

45.     In each of these four transactions, the Swiss Associate purchased the shares from an account Appel owned or controlled, directly or indirectly through an Associate.

46.     The Swiss Associate's purchase of 200,000 shares that day constituted 80% of the reported volume of shares traded that day on the market.

47.     Similarly, on February 23, 2012, the Swiss Associate purchased a total of 282,000 shares in four separate transactions at a price of $0.85 per share.

48.     In each of these four transactions, the Swiss Associate again purchased the shares from an account Appel owned or controlled, directly or indirectly through an Associate.

49.     The Swiss Associates trades on February 23, 2012 constituted more than 40% of the reported volume of shares traded that day and Appel sold the Swiss Associate the shares at the low trading price of the day.

50.     Similarly, in March 2012, Appel used an account held by an entity that his Associate owned (the "Associate Entity") to engage in another series of pre-arranged matched trades. Appel used the Associate Entity's account to sell and repurchase a large block of stock from a broker-dealer firm (the "Market-Maker"), which served as a market-maker for Rio Bravo stock and held accounts holding Rio Bravo stock beneficially owned by Appel, his Associates, and the Associate Entity.

51.     On March 13, 2012, Appel instructed a registered representative at the Market-Maker to sell 400,000 shares of Rio Bravo at $1.02 per share from the Associate Entity's account.  The Market-Maker's own account purchased the shares.

52.     Approximately two minutes after the sale was executed, the Associate Entity's account at a Canadian broker-dealer purchased 100,000 shares for $1.03 per share from the Market-Maker.

53.     Those transactions constituted **approximately** 97% of the reported volume of shares that day.

54.     On nine trading days over the next four weeks, Appel caused the Associate Entity's Canadian account to purchase an additional 300,000 shares of Rio Bravo. In each case, the Market-Maker served as the executing broker on the other side of the transaction and sold the remainder of the 400,000 shares it had purchased from the Associate Entity.

55.     On eight of those nine days, the Associate Entity's purchases were executed at the high trading price of the day.

**D.**     **Virtual Piggy**

56.     In approximately 2012, Appel recruited several Associates to acquire shares of Virtual Piggy at a discount through private transactions, private placements, and purchases on the open market.

57.     Appel exerted control over the Associates' decisions about when to buy and sell shares.

58.     For example, in January 2013, Appel emailed an Associate: "[Y]ou cant [*sic*] sell vpig [Virtual Piggy] in the market."

59.     Later, in a July 2013 email, Appel accused the same Associate of selling Virtual Piggy stock "AGAIN when we are trying to get it listed and having to support it every day." The Associate replied: "I bought it to keep it above 3 [dollars]."

60.     Between the Associates' Virtual Piggy shares and the shares he owned, Appel directly or indirectly controlled a significant portion of Virtual Piggy's float.

61.     To help Appel monitor Virtual Piggy's stock sales, he obtained from a Virtual Piggy officer weekly DTC data that showed any changes in holdings of Virtual Piggy shares at the brokerage houses.

62.     When the DTC data showed that an Associate was selling shares prematurely without Appel's permission—which would tend to lower the stock price—Appel reacted quickly

and angrily. For example, in a May 28, 2013 email thread, Appel wrote: "How much [VPIG] do you show [an Associate] having left? I would love to catch him red handed."

63.     Similarly, on November 25, 2013, Appel wrote to an Associate:

> You sold the vpig [Virtual Piggy] and rdmp [Red Mountain] while your partners were buying and then conveniently forgot to tell us until after the fact, or not at all. You've caused incredible turmoil in both of these deals because you've been backdooring us and then lying about it!!

64.     Appel also duped a member of Virtual Piggy's Board of Directors (the "Director") into engaging in matched trades of Virtual Piggy stock to manipulate the stock price.

65.     Specifically, in May 2012, Appel encouraged the Director to "support" the company by purchasing the stock in the open market.

66.     At Appel's direction, the Director opened an account at a broker-dealer with a registered representative (the "Broker Representative") who serviced a number of accounts owned or controlled by Appel and his Associates.

67.     Appel then instructed the Broker Representative to purchase 245,000 Virtual Piggy shares for the Director at a price of $1.01 per share, which was the high trading price of the previous trading day.

68.     Appel knew that the majority of Virtual Piggy shares the Director bought would be purchased from brokerage accounts Appel owned or controlled, directly or indirectly. Indeed, when Appel instructed the Broker Representative about the timing of the purchase order, Appel told the Broker Representative that two particular broker-dealers—where Appel controlled accounts holding Virtual Piggy stock—would offer sizeable blocks of the stock.

69.     On May 2, 2012, the Broker Representative executed the Director's purchase of Virtual Piggy shares, including the purchase of 190,000 shares at $1.01 per share in four separate transactions.

70.     Each of these four transactions, totaling 190,000 shares, resulted in the Director's purchase of shares from brokerage accounts Appel owned or controlled, directly or indirectly.

71.     As a result of the manipulative activity in Virtual Piggy and the other Issuers, Appel obtained over $3 million in profits by selling his shares into the public market during the Relevant Period.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Sections 17(a)(1) and 17(a)(3)

72.     Paragraphs 1 through 71 are re-alleged and incorporated by reference as if fully set forth herein.

73.     Appel, directly or indirectly, singly or in concert, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly or recklessly has: (i) employed devices, schemes or artifices to defraud or (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

74.     By reason of the foregoing, Appel, directly or indirectly, singly or in concert, violated, and unless enjoined, will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Sections 9(a)(1) and 9(a)(2)

75.     Paragraphs 1 through 71 are re-alleged and incorporated by reference as if fully set forth herein.

76.     Appel, directly or indirectly, singly or in concert, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange or any member of a national securities exchange:

a.      For the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with

respect to the market for any such security: (1) effected transactions in such security which involves no change in beneficial ownership thereof; or (2) entered an order or orders for the purchase or sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale or purchase of any security, has been or will be entered by or for the same or different parties; or

b.     Effected, alone or with one or more other persons, a series of transactions in any security other than a government security or in connection with any security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

77.     By reason of the foregoing, Appel, directly or indirectly, singly or in concert, violated, and unless enjoined and restrained will continue to violate, Exchange Act Section 9(a) [15 U.S.C. § 78i].

### THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c)

78.     Paragraphs 1 through 71 are re-alleged and incorporated by reference as if fully set forth herein.

79.     Appel, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (i) employed devices, schemes, or artifices to defraud or (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

80.     By reason of the foregoing, Appel, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Appel and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 9(a) and 10(b) [15 U.S.C. §§ 78i and 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5];

### II.

Ordering Appel to disgorge all ill-gotten gains he received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations;

### III.

Ordering Appel to pay civil money penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently prohibiting Appel from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 or that is required to file reports under Exchange Act Section 15(d), pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

## V.

Permanently prohibiting Appel from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

## VI.

Granting any other and further relief this Court may deem just and appropriate.

Dated: New York, New York
July 27, 2018

MARC P. BERGER*
REGIONAL DIRECTOR
Lara S. Mehraban*
Adam S. Grace*
Preethi Krishnamurthy*
Rhonda L. Jung*
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)
krishnamurthyp@sec.gov

*Appearing pursuant to Local Civil Rule 83.5(e)